# **Appendix – Unpublished Cases**

KeyCite Yellow Flag - Negative Treatment

Distinguished by Laboratories v. Teva Pharmaceuticals USA, Inc., N.D.Ill., November 12, 2008

1999 WL 162805
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

ABBOTT LABORATORIES, Plaintiff,

v.

SELFCARE, INC., Princeton Biomeditech
Corporation, and PBM–Selfcare, L.L.C., Defendants.

No. 98 C 7102.
|
March 15, 1999.

MEMORANDUM OPINION

GRADY, District J.

**\*1** Before the court is defendant's motion to dismiss or transfer. For the reasons explained below, the motion to transfer is granted.

BACKGROUND

All of the parties to this case engage in the business of home pregnancy tests that employ immunoassay technology. This technology allows consumers to detect the presence of a pregnancy hormone in a woman's urine. Apparently, each side believes that the other's product has infringed its patents.

On April 17, 1998, Abbott Laboratories ("Abbott") filed a complaint in the United States District Court for the District of Massachusetts (the "Massachusetts district court") against two of the defendants in the instant case, Selfcare, Inc. ("Selfcare") and Princeton Biomeditech Corporation ("PBM"). [1] The Massachusetts lawsuit involves United States Patent No. 5,654,162 (the " '162 patent") and United States Patent No. 5,073,484 (the " '484 patent"). Abbott alleged that defendants had infringed those patents by manufacturing and marketing a variety of home pregnancy tests that use immunoassay technology.

On August 5, 1998, the Massachusetts district court denied Abbott's motion for a preliminary injunction. In doing so, it relied upon pleadings, affidavits, and memoranda of law, and heard oral argument. *Abbott Lab. v. Selfcare, Inc.,* 17 F.Supp.2d 43, 45 (D.Mass.1998). On October 23, 1998, defendants filed a motion for leave to amend their answer and counterclaim to assert that Abbott had infringed two patents owned by PBM–Selfcare, United States Patent No. 5,559,041 (the " '041 patent") and United States Patent No. 5,728,587 (the " '587 patent"). The motion also sought leave to add PBM–Selfcare as a co-counterplaintiff. That motion is still pending before the Massachusetts district court.

On November 5, 1998, a day before it filed a response to that motion, Abbott Laboratories filed this declaratory judgment action. It seeks a declaration that the '041 patent and the '587 patent, the subjects of defendants' proposed counterclaim in the Massachusetts lawsuit, are invalid.

On December 7, 1998, defendants moved to dismiss or transfer this action. We indicated at a subsequent status hearing that we would be unlikely to dismiss the case, and directed the parties to file memoranda on the issue of transfer, with a particular focus on the likelihood of duplication of effort or inconsistent rulings.

DISCUSSION

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). In other words, transfer is appropriate where: "(1) venue is proper in both the transferor and transferee court; (2) transfer is for the convenience of the parties and witnesses; and (3) transfer is in the interest of justice." *Law Bulletin Publ'g, Co. v. LRP Publications, Inc.,* 992 F.Supp. 1014, 1017 (N.D.Ill.1998) (citing *Vandeveld v. Christoph,* 877 F.Supp. 1160, 1167 (N.D.Ill.1995). Because the parties agree that venue is proper in both Massachusetts and Illinois, we need only address the second and third elements. Because the interests of justice "may be determinative in a particular case, even if the convenience of witnesses and witnesses might call for a different result," we begin our discussion there. See *Coffey v. Van Dorn Iron Works,* 796 F.2d 217, 220 (7th Cir.1986).

A. Interests of Justice

**\*2** When a case is transferred to a district in which a related case is pending, the expectation is that the two cases will be consolidated pursuant to Rule 42(a) of the Federal Rules of Civil Procedure, if practicable. *Waller v. Burlington N. R.R. Co.,* 650 F.Supp. 988, 991 (N.D.Ill.1987). Consolidation not only conserves scarce judicial resources, but also reduces the resources ultimately expended by the litigants. *Keppen v. Burlington N. R.R. Co.,* 749 F.Supp. 181, 183–84 (N.D.Ill.1990). By preventing duplicative efforts on the part of both the courts and the parties, transfer and subsequent consolidation serve the interests of justice within the meaning of the venue transfer statute. As the Supreme Court has acknowledged, "[t]o permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that § 1404(a) was designed to prevent." *Continental Grain Co. v. Barge FBL–585,* 364 U.S. 19, 26 (1960). Transfer of venue also curbs the risk of inconsistent judgments. *Countryman v. Stein Roe & Farnham,* 681 F.Supp. 479, 484 (N.D.Ill.1987). These concerns have led this district to adopt "a strong policy in favor of transferring a case to the district where a related action is pending." *Keppen,* 749 F.Supp. at 184.

The existence of the pending related action in Massachusetts persuades us to transfer this case. Abbott argues that the actions differ because the Massachusetts lawsuit involves its patents while this action involves Selfcare's patents.[2] The two actions, even though directed to different patents, involve the same parties and substantially similar technology. They also involve similar complex factual and legal questions that will require the expenditure of considerable time and effort. Requiring two courts to devote limited resources educating themselves about the same underlying technology would undermine values of judicial economy. By holding a preliminary injunction hearing, the Massachusetts district court has already familiarized itself with this technology. There is no reason we should duplicate those efforts. Abbott also argues that additional discovery in these intertwined actions would "bog the parties down," but fails to persuade us that this would occur. Appropriate case management will avoid any such problem.

In addition, we do not wish to risk conflicting rulings. Abbott argues that the Massachusetts district court has not indicated that it intends to hold a *Markman* hearing, but that fact does not assuage our concerns. First, that court's present disinclination to hold a hearing does not mean that such a hearing will never take place. Second, we can imagine many identical issues that might arise in each court, quite apart from *Markman* issues. For example, the discovery process might produce unseemly confusion or conflict between the courts.[3]

**B. Convenience**

**\*3** Normally, the moving party must show that the transferee court is more convenient. *Heller Fin., Inc. v. Midwhey Powder Co., Inc.,* 883 F.2d 1286, 1293 (7th Cir.1989); *Chemical Waste Management, Inc. v. Sims,* 870 F.Supp. 870, 876 (N.D.Ill.1994). In determining whether the moving party has met its burden, the court should consider: (1) plaintiff's forum choice; (2) the situs of material events; (3) ease of access to evidence; (4) convenience of witnesses; and (5) convenience of the parties. *College Craft Cos., Ltd. v. Perry,* 889 F.Supp. 1052, 1054 (N.D.Ill.1995); *Chemical Waste,* 870 F.Supp. at 876.

Here, however, there is no indication that the relative conveniences favor one forum over the other. The two actions will likely involve many of the same witnesses and much common documentary evidence. Discovery will occur at the appropriate locations under the Rules, regardless of where the cases are pending.

The interests of justice render the plaintiff's choice of forum, and the corresponding "first-to-file" doctrine, largely irrelevant. Abbott correctly points out that the doctrine applies to declaratory judgment actions in patent cases. *Genentech, Inc. v. Eli Lilly & Co.,* 998 F.2d 931, 938 (Fed.Cir.1993). Nonetheless, where the interests of justice, especially "considerations of judicial and litigant economy," demand it, the trial court has discretion to dismiss a first-filed action. *Serco Servs. Co., L.P. v. Kelley Co., Inc.,* 51 F.3d 1037, 1039 (Fed.Cir.1995) (citation omitted). By extension, considerations of judicial economy warrant transfer, a far less drastic remedy than dismissal.[4]

CONCLUSION

For the foregoing reasons, we grant defendant's motion to transfer, which renders moot the defendant's alternative motion to dismiss. Pursuant to 28 U.S.C. § 1404(a), this case will be transferred to the United States District Court for the District of Massachusetts.

Abbott Laboratories v. Selfcare, Inc., Not Reported in F.Supp.2d (1999)

1999 WL 162805

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 162805

Footnotes

1    PBM–Selfcare, L.L.C., a subsidiary of the two named defendants and the third defendant in this case, was not named in that action.

2    Abbott further argues that the immunoassay technology is extremely common, and this scientific process has been the subject of many federal cases. Contrary to Abbott's implication, however, our holding today is not precedent for the transfer of all cases involving this technology, regardless of the identity of the parties and the existence of a relationship between the patents, to the Massachusetts district court. Nor would our ruling today require all unrelated cases between these particular parties to go before the Massachusetts district court. It addresses only the facts of this case, which involve the same parties' claims regarding substantially similar patent issues.

3    The parties' submissions on this motion illustrate this example. They appear to differ strongly over whether a discovery cut-off for March 31, 1999, exists in the Massachusetts action. Because any dispute over discovery in that lawsuit is properly before the Massachusetts district court, we take no position on it here. We only note that, were we to do so, we might well risk coming into conflict with a subsequent order by the Massachusetts district court on precisely the same issue.

4    Because the interests of justice are determinative of this case, we need not resolve the parties' dispute over which party filed first. The dispute seems to depend largely on whether the Massachusetts district court grants defendant's motion for leave to file a counterclaim in that action. For the purposes of this motion only, we assume that Abbott's instant declaratory judgment action was the first to be filed.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 4365340
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

Robert H. ALAND, Plaintiff,
v.
Dirk KEMPTHORNE, et al., Defendants.

No. 07-CV-4358.
|
Dec. 11, 2007.

**Attorneys and Law Firms**

Robert H. Aland, Winnetka, IL, pro se.

Coby H. Howell, U.S. Attorney's Office, Portland, OR, Kurt
N. Lindland, United States Attorney's Office, Chicago, IL, for
Defendants.

### *MEMORANDUM OPINION AND ORDER*

JAMES B. ZAGEL, District Judge.

### I. Introduction

 **\*1** This matter is before the Court on Motion to Transfer
Venue pursuant to 28 U.S.C. § 1404(a), filed by H. Dale
Hall, U.S. Fish and Wildlife Service Director, and Dirk
Kempthorne, Secretary of the Interior (collectively "Federal
Defendants") on September 4, 2007. Defendants seek to
transfer the case to the District of Idaho for the sake of
judicial economy, convenience, and so the present case may
be coordinated with a related case pending in the United
States District Court for the District of Idaho. Plaintiff filed
an objection to the Motion to Transfer and Defendants filed
a reply in support of their Motion. I allowed Plaintiff to file
a short sur-reply, which I have read and considered. For the
following reasons, Defendants' motion is granted and the case
shall be transferred to the District of Idaho.

### II. Background

This cause of action arises out of a challenge to the U.S.
Fish and Wildlife Service's ("FWS") grizzly bear Final
Rule ("Final Rule"). 72 Fed.Reg. 14866 et seq. (Mar. 29,
2007) (to be codified at 50 C.F.R. pt. 17). The Final Rule,
effective April 30, 2007, designated grizzly bears in the

Greater Yellowstone Area ("GYA") and surrounding area as
a distinct population segment ("DPS") pursuant to 16 U.S.C.
§ 1532(16) and thereby removed that DPS from the list of
threatened and endangered species under the Endangered
Species Act of 1973 ("ESA"), as set forth in 50 C.F.R. § 17.11.
On August 2, 2007, Plaintiff filed this suit for declaratory and
preliminary and permanent injunctive relief under the citizen
suit provision of the ESA, 16 U.S.C. § 1540(g)(1), and the
Administrative Procedure Act ("APA"), 5 U.S.C §§ 551-706,
seeking to declare invalid and enjoin the implementation of
the Final Rule.

Plaintiff, who resides in Illinois, regularly enjoys visits to the
GYA, including areas known to be inhabited by grizzly bears.
Between 1998 and the present, Plaintiff has visited the GYA
on almost a monthly basis, staying for six to ten days or more
at a time. Over the past few years, Plaintiff has been active
in seeking to protect and preserve the habitat for the grizzly
bears through financial and physical endeavors. Plaintiff
submitted initial written comments in February 2006 to FWS
in opposition to the proposed de-listing of the grizzly bears,
and he supplemented those initial comments throughout 2006
and 2007. Following the issuance of the Final Rule, which
removed the DPS of grizzly bears in the GYA from the
list of threatened and endangered species under the ESA,
Plaintiff filed this lawsuit complaining: (1) FWS erroneously
concluded that grizzly bears have recovered in the GYA; (2)
FWS's designation of the grizzly bears as a DPS violated
the ESA and FWS policy; (3) FWS failed adequately to
consider the present or threatened destruction, modification or
curtailment of grizzly bears' habitat or range in the GYA; (4)
FWS failed adequately to consider overutilization of grizzly
bears in the GYA; (5) FWS failed adequately to consider
disease or predation that threatens grizzly bears in the GYA
with extinction; (6) FWS failed adequately to consider the
inadequacy of existing regulatory mechanisms that threaten
grizzly bears in the GYA with extinction; (7) FWS failed
adequately to analyze other natural or manmade factors that
threaten grizzly bears' continued existence in the GYA; (8)
FWS might have erroneously and unlawfully used factors
other than the best available scientific and commercial data
to delist grizzly bears in the GYA; (9) peer review in the
de-listing rulemaking was fundamentally flawed; (10) FWS
erroneously and unlawfully failed to adhere to mandatory
procedural requirements for de-listing grizzly bears in the
GYA; (11) the public comment period was fundamentally
flawed; and (12) grizzly bears in the GYA will suffer
irreparable harm if they are allowed to be hunted beginning
in Fall 2007.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**\*2** On June 4, 2007, a number of environmental groups also filed a complaint for declaratory and injunctive relief challenging the Final Rule in the District of Idaho. *See Complaint for Declaratory and Injunctive Relief, Western Watersheds Project v. Servheen,* No. 07-cv-243 (Jun. 4, 2007). In *Western Watersheds,* the defendants include the two Federal Defendants named here, as well as Christopher Servheen, FWS's Grizzly Bear Recovery Coordinator, and the FWS itself (collectively "Idaho Defendants"). The Idaho Defendants filed their Answer on August 9, 2007. A number of parties are currently seeking either intervenor or *amicus* status in the District of Idaho litigation.[1] The Plaintiffs in *Western Watersheds* similarly challenge the FWS' designation of the GYA grizzly bears as a DPS and the Final Rule removing that DPS from the federal list of endangered and threatened wildlife. Both the Plaintiff here and the Plaintiffs in *Western Watersheds* seek a declaration that the FWS' Final Rule violates the ESA and/or the APA. Plaintiff(s) in both cases also seek to enjoin the FWS from designating the grizzly bears in the GYA as a DPS and from removing that DPS from the protected ESA list.

Federal Defendants filed their motion to transfer this case to the District of Idaho over concern that litigation on the merits of the Final Rule in two different forums could result in inconsistent orders. They also argue that litigation of the same Final Rule in two forums needlessly wastes judicial resources. And, they request transfer to the District of Idaho because *Western Watersheds* was filed there first.

### III. Standard

For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought. 28 U.S.C. § 1404(a). Section 1404(a) places discretion with this court to adjudicate motions for transfer according to "individualized, case-by-case consideration of convenience and fairness." *Coffey v. Van Dorn Iron Works,* 796 F.2d 217, 219 (7th Cir.1986) (quoting *Van Dusen v. Barrack,* 376 U.S. 612, 622, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964)). The relevant factors the district court should consider are: the preference given to plaintiff's choice of forum; convenience of the parties, counsel, and witnesses; the location of the record; and the interest of justice. 15 Charles A. Wright, Arthur R. Miller & E. Cooper, *Federal Practice and Procedure §* 3848-54 (2d. ed.1986). The language of § 1404(a) does not

indicate the relative weight to be accorded to each factor. *Coffey,* 796 F.2d at 220 n. 3.

### IV. Discussion

#### A. Proper Venue

The threshold consideration in a Section 1404(a) motion is that there must be an "other district ... where [the action] might have been brought." *See Van Dusen,* 376 U.S. at 616. Venue is proper in any judicial district in which: (1) a defendant in the action resides; (2) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated; or (3) the plaintiff resides if no real property is involved in the action. 28 U.S.C. § 1391(e) (governing venue in civil actions against federal officers and agencies). Neither party disputes that venue is proper in Illinois pursuant to § 1391(e)(3). However, venue may be proper in more than one district because, under § 1391(e)(2), "there may be several districts that qualify as a situs of such 'substantial' activities." David D. Siegel, *Commentary on 1988 and 1990 Revision of Section 1391,* 28 U.S.C.A. § 1391 (1993) at 9.

**\*3** Federal Defendants argue that a substantial part of the events giving rise to the claims occurred in the District of Idaho because the geographic location of the GYA grizzly bear DPS includes eastern Idaho.[2] Also, the FWS held one of four open houses during the proposal period of the Final Rule in Idaho in order to collect and consider comments before issuing the final order. 70 Fed.Reg. at 69854.[3] Plaintiff argues that these events do not fall within the ambit of what was intended by § 1391(e)(2) and suggests instead that the language "substantial part of the events or omissions" more readily certifies Washington, D.C. as proper venue because that is where the head offices of Defendants' agencies are located and where Defendant Hall approved and signed the Final Rule.[4]

Because a "substantial part of the events giving rise" to Plaintiff claims occurred in Idaho, venue is proper in that district. 28 U.S.C. § 1391(e)(2); *see Nw. Forest Res. Council v. Babbitt,* 1994 WL 908586, at \*2 (D.D.C. Apr.13, 1994) (finding venue proper under § 1391(e) in Western District of Washington where population of marbled murrelets were located and where FWS maintained field offices that assisted in promulgating the challenged rule). The gravamen of Plaintiff's complaint is a concern for the continued viability of the DPS of grizzly bears located in the GYA. The area

covered by the DPS boundaries encompasses eastern Idaho, southern Montana, and the northwest corner of Wyoming. A substantial portion of the DPS is located in the District of Idaho. Also, during the process of designating the boundaries of the DPS and eventually publishing the Final Rule, the FWS considered comments by those in and around the District of Idaho. The FWS based its findings on significant quantities of information gathered in and around the GYA because the material facts in this case are derived from that location. The nexus to Idaho is clear, and therefore I find that the District of Idaho qualifies as a proper venue under § 1391(e)(2).

*B. Convenience*

The convenience component of § 1404(a) invites me to consider the following five factors: (1) the plaintiff's choice of forum; (2) conveniences for the parties; (3) conveniences for witnesses; (4) location of material events; and (5) location and ease of access to sources of proof. *Willis v. Hilton Hotels Corp.,* 2007 WL 611262, at *3 (N.D.Ill. Feb.22, 2007). Plaintiff's choice of forum is the Northern District of Illinois because he lives in a north suburb of Chicago and beginning in January 2008, he will teach a weekly class at a law school located in Chicago. However, while a "large measure of deference is due to the plaintiff's freedom to select his own forum[,] ... this factor has minimal value where none of the conduct complained of occurred in the forum selected by the plaintiff." *Chicago, Rock Island & Pac. RR. Co. v. Igoe,* 220 F.2d 299, 304 (7th Cir.1955) (internal quotations omitted); *see also Ruppert v. Principal Life Ins. Co.,* 2007 WL 2025233, at *5 (S.D.Ill., July 9, 2007) (quoting the same rule); *Heston v. Equifax Credit Info. Serv. LLC,* No. 03 C 2476, 2003 WL 22243986, at *1 (N.D.Ill. Sept.26, 2003) (reasoning that plaintiff's failure to allege facts connecting her claims to the district where the plaintiff chose to sue "weighs in favor of transfer"). Just like in *Chicago, Rock Island,* this case involves "no controverted question which depends on any event occurring in the Northern District of Illinois. Both parties must rely upon evidence of events entirely removed from [this] District." *Chicago, Rock Island,* 220 F.2d at 304. Therefore, because there is no material connection between this District and the transactions underlying this case, I afford little deference to Plaintiff's choice of forum in the Northern District of Illinois.

**\*4** The convenience of parties and witnesses does not militate strongly in favor of either the Northern District of Illinois or the District of Idaho. The Federal Defendants reside in the vicinity of Washington, D.C., and to the extent that they will also be litigating the *Western Watersheds* case

in Idaho, that district is more convenient. I observe that Plaintiff's residence and teaching position in this District poses some inconvenience for him to travel to the District of Idaho, though since he tries this case pro se, his travel expenses are less. Further, the parties agree that this case will largely be decided on an administrative record and APA review record principles, meaning that neither of the parties will have to make extensive travels to Idaho. The electronic filing system allows parties to proceed with briefing without actually traveling to the courthouse. Also, the parties agree that a trial in this case is unlikely and the probability of calling witnesses is low, so the convenience of witnesses is not a salient issue either. [5]

The location of material events in this case and location of sources of proof indicate that Idaho is a slightly more convenient forum. Plaintiff contends that the "material events" giving rise to his cause of action were Federal Defendants' decision to delist the GYA grizzly bears and the signing of the Final Rule, which took place in Washington, D.C. While this is true, it does not affect the convenience equation for this court at all. Defendants contend that the location of the DPS of grizzly bears, which includes eastern Idaho, tips the scales of convenience in favor of Idaho, which it does. The administrative record and culminating Final Rule were based on research and data collected in the GYA, and the Plaintiff has already suggested that he may seek permission to conduct limited discovery to supplement that record. Presumably at least part of the information sought, given the nature of Plaintiff's complaint, will be related to events that occurred in the GYA and conditions that affect the DPS at the center of this case. Also, to the extent that the FWS' administrative record with regard to the Final Rule is already being compiled and sent to the District of Idaho for the *Western Watersheds* case, that district is more convenient for the sources of proof in this case (although not by much because to the extent that record is stored electronically, copies of CDs or PDFs are easily made and distributed). Overall, because there is no material connection to this District and because the material facts are located in and around the GYA, the convenience analysis tips in favor of the District of Idaho.

*C. Interests of Justice*

Lastly, and most significantly, § 1404(a) requires that I consider the interests of justice in this motion to transfer venue. The interests of justice is a "somewhat amorphous term" consisting of several variables including: (1) the

speed of the proceeding; (2) the court's familiarity with applicable law; (3) the conservation of judicial resources; and (4) the relation of the community to the occurrence and the desirability of resolving the controversy in its locale. *Hawksbill Sea Turtle v. FEMA,* 939 F.Supp. 1, 4 (D.D.C.1996); *Heller Financial, Inc. v. Midwhey Powder Co., Inc.,* 883 F.2d 1286, 1293 (7th Cir.1989); *Willis,* at *3 (citing *IFC Credit Corp. v. Eastcom, Inc.,* 2005 WL 43159, *2 (N.D.Ill. Jan.7, 2005)); *see also* 15 Charles A. Wright, Arthur R. Miller & E. Cooper, *supra,* § 3854. "Amorphous though it may be, the interest of justice may be decisive in ruling on a transfer motion even though the convenience of the parties and witnesses point in a different direction." *Hawksbill,* 939 F.Supp. at 4. The interests of justice includes both the interest of the parties as well as the interests of society in general. *Chicago, Rock Island,* 220 F.2d at 304 (citing *United States v. National City Lines, Inc., D.C.,* 7 F.R.D. 393, 397, 402 (S.D.Cal.1947)).

**\*5** The most salient considerations under this prong given the circumstances presented here are the conservation of judicial resources and the relation of the community and desirability of resolving the controversy in its locale.[6] § 1404(a) was designed to prevent the "situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts." *Continental Grain Co. v. FBL-585,* 364 U.S. 19, 26, 80 S.Ct. 1470, 4 L.Ed.2d 1540 (1960). While the *Western Watersheds* case currently pending in the District of Idaho does not present *precisely* the same issues raised in this case, both cases essentially involve a challenge under the ESA and APA to the FWS' Final Rule regarding the DPS of grizzly bears in the GYA. *See Nw. Forest Res. Council,* 1994 WL 908586, at *3 (granting transfer of venue where two cases in different districts arose out of the same rule-making process and calling factual background and legal issues "similar and largely intertwined"). Not all of the claims in both cases are identical, but the amount of overlap is significant and the chance of conflicting orders is real. *Western Watersheds* was filed before this case, and several parties have already moved to intervene.

Finally, the local significance of the interests of the states which are a home to the DPS of grizzly bears cannot be ignored. The management of the grizzly bears is of critical importance to those states because those states will inherit the primary management responsibility of the grizzly bears if the Final Rule remains in effect. Those states have already spent a considerable amount of time and resources developing their state management plans, and thus this dispute more closely involves the interests of any of those states over those of Illinois. Therefore, the controversy over the FWS' rulemaking that labeled the population of grizzly bears in the GYA a DPS is more appropriately litigated in a court in Idaho, Wyoming, or Montana, where that DPS is found. In *Nw. Forest Res. Counsel,* the Court transferred a challenge under the ESA of the listing of the marbled murrelet from the District of Columbia to the Western District of Washington, where much of that bird's habitat is found. *Nw. Forest Res. Counsel,* 1994 WL 908586, at *4. An important consideration with regard to the interests of justice was the fact that "marbled murrelets do not inhabit land or water in-or anywhere near-the District of Columbia." *Id.* The same reasoning applies here and supports a transfer of venue to the District of Idaho.

**V. Conclusion**

Venue for this action is proper in both the Northern District of Illinois and the District of Idaho. Although Plaintiff brought this action in the Northern District of Illinois, in light of all of the circumstances, the interests of justice and convenience of the parties sufficiently outweighs Plaintiff's right to choose the forum. Transfer of this action to the District of Idaho is appropriate. Accordingly, it is hereby ordered that Defendants' motion is granted, pursuant to 28 U.S.C. § 1404(a). This action shall be transferred to the District of Idaho forthwith.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 4365340

Footnotes

1    Federal Defendants point to at least five other parties who have moved to participate in the litigation. The Safari Club International moved to intervene as a party defendant on June 12, 2007. U.S. Sportsman's Alliance Foundation moved to file an amicus brief in support of Idaho Defendants' position on July 18, 2007. The State of Wyoming moved to intervene as a party defendant on August 2, 2007. According to the Federal Defendants, the State of Montana will also be filing a motion to intervene on its behalf, if it hasn't already done so. Additionally, the National Wildlife Federation moved to intervene on September 27, 2007, and that motion was denied by the Idaho court on October 31, 2007.

Aland v. Kempthorne, Not Reported in F.Supp.2d (2007)

2007 WL 4365340

2     Federal Defendants also make two additional arguments in the venue portion of their reply motion: (1) Plaintiff's twelfth claim for relief seeks to invalidate the Final Rule, which in turn would require actions taken by the State of Idaho to enact new laws to protect the bears from hunting, and (2) courts recognize the importance of transferring ESA cases to a district in which the species is located. These arguments are viable, but they are more properly considered in the "interests of justice" prong of the venue analysis. I will consider them accordingly.

3     The open house in Idaho was held in Idaho Falls on January 12, 2006. Other open houses were held in Bozeman, Montana and Jackson, Wyoming. An open house and a public hearing was held in Jackson, Wyoming. 70 Fed.Reg. at 69854.

4     I do not address whether or not Washington, D.C. is a proper venue for this case because neither party has requested me to do so.

5     Both parties spend some time addressing the issue of convenience with respect to Defendants' attorneys. However, "the convenience of an attorney is not a factor in considering a motion to transfer venue," and thus I will not consider it. *Flexicorps, Inc. v. Benjamin & Williams Debt Collectors, Inc.,* No., 2007 WL 1560212, at *5 n. 3 (N.D.Ill. May 29, 2007) (internal quotation omitted).

6     The speed of disposition and the court's familiarity with the applicable law are negligible factors in this case.

---

**End of Document**            © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:20-cv-00512 Document #: 46-1 Filed: 04/27/20 Page 10 of 29 PageID #:254
Allman v. McGann, Not Reported in F.Supp.2d (2003)
2003 WL 1811531

KeyCite Yellow Flag - Negative Treatment
Distinguished by Barker v. Atlantic Pacific Lines, N.D.Ill., August 14, 2013

2003 WL 1811531
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

James ALLMAN, Plaintiff,
v.
Kevin D. MCGANN, Michael Cipicchio,
and Scott D. Sullivan, Defendants.

No. 02 C 7442.
|
April 4, 2003.

OPINION AND ORDER

NORGLE, J.

*1 Before the court is Defendant, Michael Cipicchio's ("Cipicchio") motion to dismiss Plaintiff, James Allman's ("Allman") complaint for lack of personal jurisdiction brought pursuant to Federal Rule of Civil Procedure 12(b)(2). For the following reasons, Cipicchio's motion is granted.

I. BACKGROUND [1]

Allman is seeking to recover commissions allegedly owed for work performed as an employee of a subsidiary of MCI WorldCom Network Services, Inc. ("WorldCom"). Allman, a citizen of the State of Illinois, began working for a subsidiary of WorldCom in March of 1991. Allman was employed as a major account executive and was compensated for his services by was of salary, commissions and bonuses, as set forth in MCI's Major Account Executive Compensation Plan ("the Comp Plan"). Allman resigned his employment with WorldCom effective November 2, 2001. Allman alleges that at the time of his resignation, his commissions report indicated that he was owed $700,339.49, in addition to unreported commissions for October and November of 2001, an amount which WorldCom has not paid.

Initially, in order to seek redress for his grievance, Allman filed suit against WorldCom. This case was filed in the United States District Court for the Northern District of

Illinois, Eastern Division, and was assigned to the Honorable Matthew F. Kennelly. See Allman v. WorldCom. Inc., docket number 01 C 9741. In that case, WorldCom filed a motion to dismiss and compel arbitration. WorldCom's motion to dismiss and compel arbitration was rendered moot as a result of Allman's motion to voluntarily dismiss the case pursuant to Federal Rule of Civil Procedure 41(a). Thereafter, Allman proceeded to arbitrate his claim; however, as a result of WorldCom's petition for bankruptcy pursuant to Chapter 11 of the Bankruptcy Code, the arbitration proceedings were stayed. Impatient with the progress of his arbitration as a result of the bankruptcy stay, Allman filed the present case against various individual officers of WorldCom, including Kevin D. McGann, Michael Cipicchio, and Scott D. Sullivan (collectively "the Defendants"). [2]

This court initially dismissed the present case for failure to properly plead subject matter jurisdiction. Thereafter, Allman filed an amended complaint, properly pleading subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). In Count I of the amended complaint, Allman contends that the Defendants' failure to pay his final commission resulted in a violation of the Illinois Wage Payment and Collection Act, 820 Ill. Comp. Stat. 115/1 et seq. ("IWPCA"). Count II of the amended complaint seeks attorney fees under the IWPCA. Lastly, in Count III of the amended complaint, Allman contends that the Defendants tortiously interfered with his employment contract rights.

Returning to the facts underlying Allman's claims for relief, in regard to commissions, WorldCom maintained a commissions bank account for Allman in WorldCom's Commissions Accounting department. WorldCom regularly provided Allman with commissions reports detailing the amounts held in Allman's commissions account. Under the Comp Plan, Allman would receive a maximum of $25,000 per month from commissions, with any amount of commission in excess of $25,000 to be held in Allman's commissions bank account. In the event that Allman's commissions for a given month were less than $25,000, funds would be taken out of Allman's commissions account and applied to assure a monthly commission of $25,000. Furthermore, in the event of termination, Allman would continue to receive a maximum of $25,000 per month from commissions until his commissions account was exhausted.

*2 Cipicchio, a citizen of the State of Mississippi, was, and is, employed by MCI as Vice President of Corporate Processing Services. Cipicchio performs his

2003 WL 1811531

duties on behalf of WorldCom from an office located in Mississippi. In that position Cipicchio has responsibility for administering WorldCom's compensation plans and commission accounting. Prior to Allman's resignation, Cipicchio caused an audit to be performed on the accounts of approximately 50 major account executives, including Allman. Allman alleges that the Defendants directed WorldCom to "intentionally and purposefully" freeze many of the commission bank accounts that had been the subject of the internal audit, including Allman's account. Allman contends that the Defendants knew of WorldCom's obligation to pay Allman under the Comp Plan and that the Defendants purposefully prevented the payment of Allman's final compensation, resulting in a violation of the IWPCA and tortious interference with Allman's employment contract rights.

Cipicchio has responded to Allman's amended complaint by filing a motion to dismiss for lack of personal jurisdiction, which the court now addresses.

## II. STANDARD OF DECISION

Once a defendant has challenged a court's exercise of personal jurisdiction, through a motion to dismiss for lack of personal jurisdiction, the plaintiff has the burden of demonstrating that the court's exercise of personal jurisdiction over a defendant is proper. See *RAR. Inc. v. Turner Diesel, Ltd.,* 107 F.3d 1272, 1276 (7th Cir.1995). "In deciding a motion to dismiss for lack of personal jurisdiction, the court may receive and consider affidavits from both parties." *Glass v. Kemper Corp.,* 930 F.Supp. 332, 337 (N.D.Ill.1996) (citing *Turnock v. Cope,* 816 F.2d 332, 333 (7th Cir.1987)). "The court resolves factual disputes in the pleadings and affidavits in favor of the plaintiff, but takes as true facts contained in the defendant's affidavit that remain unrefuted by the plaintiff." *Id.* (citing *Nelson v. Park Industries, Inc.,* 717 F.2d 1120, 1123 (7th Cir.1983)).

## III. DISCUSSION

"A federal district court exercising diversity jurisdiction has personal jurisdiction, of course, 'only if a court of the state in which it sits would have such jurisdiction.' " *RAR. Inc. v. Turner Diesel, Ltd.,* 107 F.3d 1272, 1275 (7th Cir.1997) (citing *Klump v. Duffus,* 71 F.3d 1368, 1371 (7th Cir.1995). This federal district court, sitting in diversity, will

have personal jurisdiction over a nonresident defendant only where: 1) Illinois statutory law properly grants jurisdiction; 2) the exercise of personal jurisdiction would not violate Illinois constitutional law due process requirements; and 3) the exercise of personal jurisdiction would not violate the United States constitutional law due process requirements. See *Central States, Southeast and Southwest Areas Pension Fund v. Reimer Express World Corp.,* 230 F.3d 934, 946 (7th Cir.2000).

**\*3** In this case, the three inquiries may be collapsed into one, with an analysis of whether the exercise of personal jurisdiction would violate the United States constitutional law due process requirements as the pivotal inquiry. See *Klump,* 71 F.3d at 1371 (indicating "if the contacts between the defendant and Illinois are sufficient to satisfy the requirements of due process, then the requirements of both the Illinois long-arm statute and the United States Constitution have been met, and no other inquiry is necessary"); *see also Rollins v. Ellwood,* 565 N.E.2d 1302, 1315 (Ill.1990) (indicating 'Illinois' long-arm statute ... may well restrict the power that the courts of this State have to bring nonresidents before them to a greater extent than do the Federal due process clause and the 'minimum contacts' standard developed over the years by the [United States] Supreme Court"); *see also RAR,* 107 F.2d at 1276 (indicating that "Illinois courts have given little guidance as to how state due process protection differs from federal protection in the context of personal jurisdiction").

As elucidated by *International Shoe Co. v. Washington,* 326 U.S. 310 (1945) and its progeny, to satisfy the requirements of federal due process, a non-resident defendant must have established sufficient "minimum contacts" with the forum state such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. See *generally RAR,* 107 F.2d at 1277. To establish that such "minimum contacts" have been established, "[i]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U .S. 235, 253 (1958). In determining whether sufficient "minimum contacts" exist, courts consider whether a defendant could "reasonably anticipate being haled into court" in Illinois. See *World–Wide Volkswagen Corp. v. Woodsen,* 444 U.S. 286, 297 (1980). This requirement is satisfied when the defendant intentionally directs his activities at forum state residents and the litigation arises from injuries allegedly caused by those

activities. See *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474 (1985).

*A. Allman's IWPCA Claim for Relief*

One of Allman's arguments for subjecting Cipicchio to the personal jurisdiction of a court in Illinois is premised on the Illinois Wage Payment and Collection Act, which provides, *inter alia:* "Any officers of a corporation or agents of an employer who knowingly permit such employer to violate the provisions of this Act shall be deemed to be the employers of the employees of the corporation." 820 Ill. Comp. Stat. 115/13 (2003). Allman argues that because Cipicchio knowingly permitted WorldCom to withhold Allman's final compensation, Cipicchio is deemed to be Allman's employer under the IWPCA, and therefore subject to personal jurisdiction in Illinois because WorldCom would be subject to personal jurisdiction in Illinois. However, the court cannot accept Allman's personal jurisdiction syllogism in light of existing federal due process jurisprudence.

 **\*4** The present case is virtually indistinguishable from other cases decided in this district dealing with the IWPCA and the issue of personal jurisdiction over non-resident officers and directors of corporations. In *McMurray v. Improvenet, Inc.,* No. 00 C 7137, 2001 WL 561376 \*1 (N.D.Ill. May 22, 2001) an Illinois employee filed suit against his former employer and the president of that corporation, both non-residents of Illinois, alleging violations of the IWPCA and tortious interference with contract. The president of the corporation filed a motion to dismiss for lack of personal jurisdiction, which the court granted. *Id.* at \*2. The president of the corporation had visited Illinois approximately four times on behalf of the corporation, once meeting with the plaintiff. *Id.* at \*3. In addition, the president of the corporation had communicated with the plaintiff via telephone on numerous occasions. *Id.* The court stated that the single meeting with the plaintiff was "too tenuous to justify asserting personal jurisdiction over [the president of the corporation]." *Id.* In addition, the numerous telephone contacts would not support the exercise of personal jurisdiction because the substance of those communications revealed nothing about the plaintiff's specific claims for relief. *Id.* In sum, the court indicated: "We cannot say that, through these limited contacts, [the president of the corporation] could reasonably anticipate being required to defend himself here." *Id.* Additionally, the court indicated that assuming that minimum contacts could be established, "we would lack jurisdiction over [the president of the corporation] because he is protected by the 'fiduciary shield' doctrine." *Id.*

In *Krok v. Burns & Wilcox. Ltd.,* No. 98 C 5902, 1999 WL 262125 \*1 (N.D. Ill. April 16, 1999) an Illinois employee filed suit against his former employer and four officers and directors of that corporation, all non-residents of Illinois, alleging violations of the IWPCA, tortious interference with contract, and unjust enrichment. The four non-resident officers and directors of the corporation included: H. Kaufman, former owner of the corporation; A. Kaufman, Executive Vice President, Director, and current owner of the corporation; Price, Senior Vice President of the corporation; and Horton, Executive Vice President and Director of the corporation. *Id.* The four non-resident officers and directors of the corporation filed motions to dismiss for lack of personal jurisdiction. *Id.* at \*2. Two of the defendants, H. Kaufman and A. Kaufman, had only visited Illinois a few times a year to transact unrelated business, and the court dismissed them from the complaint. *Id.* at \*3. The two remaining defendants, Price and Horton, visited Illinois for the purpose of meeting with the plaintiff, and subsequently terminated his employment at that meeting. *Id.* at \*4. The court indicated that by traveling to Illinois to terminate the plaintiff's employment, Price and Horton performed an act which caused an injury in Illinois, thus subjecting them to the personal jurisdiction of the court to answer the plaintiff's claim of tortious interference with contract. *Id.* As to the plaintiff's claim of violations of IWPCA, the court indicated: "[The IWPCA count] arises out of a wage payment dispute, not a wrongful termination action. Thus, under 5/2–209(a)(1), this court should not exercise personal jurisdiction if [the IWPCA count] were standing alone." *Id.* However, the court subjected Price and Horton to personal jurisdiction in Illinois on the rationale that since they were subject to personal jurisdiction as to the tortious interference with contract claim, their "burden does not substantially increase by this court asserting jurisdiction over them as to [the IWPCA count]." *Id.* The court also rejected the arguments of Price and Horton that the fiduciary shield doctrine should prevent the court from exercising personal jurisdiction over them, based on the finding that Price and Horton were acting to serve their personal interests. *Id.*

 **\*5** In the present case, as compared with *McMurray* and *Krok,* there are even fewer contacts between Cipicchio, Allman and Illinois. It is undisputed that Cipicchio has never lived in Illinois, never owned property in Illinois, never paid taxes in Illinois, and never been involved in any litigation in Illinois. Cipicchio's only contacts with Illinois occurred in June of 2000 when he attended a conference in Illinois, and Cipicchio did not have any contact with Allman at

that time. In fact, Cipicchio has never had any contact with Allman, whether by way of telephone, mail, or electronic communication. The actions of Cipicchio cannot be said to indicate that he "purposefully availed" himself to Illinois. Viewed along a "minimum contacts" spectrum, the contact between Cipicchio and Illinois is virtually non-existent and completely unrelated to Allman's claims for relief. This court cannot say that Cipicchio could have reasonably anticipated being haled into court in Illinois, as a result of performing his duties for WorldCom outside of Illinois.

In short, Allman's syllogism based on the text of the IWPCA proves too much, and ignores the lessons of *International Shoe* and its progeny. Therefore, the court finds that Allman has failed to meet his burden of demonstrating that the court's exercise of personal jurisdiction over Cipicchio is proper as to Counts I and II of the amended complaint.

*B. Allman's Tortious Interference with Contract Claim for Relief*

Allman's alternative argument for subjecting Cipicchio to the personal jurisdiction of a court in Illinois is premised on the contention that Cipicchio's conduct qualifies as a tortious act, thereby subjecting Cipicchio to Illinois' long-arm statute, 735 Ill. Comp. Stat. 5/2–209(a)(2) (2003).

As indicated above, since the three inquiries may be collapsed into one, with an analysis of whether the exercise of personal jurisdiction would violate the United States constitutional law due process requirements as the pivotal inquiry, the court will analyze whether the contacts of Cipicchio with Illinois satisfy the requirements of federal due process. *See Klump,* 71 F.3d at 1371.

At bottom, Allman's alternative argument for personal jurisdiction reduces itself to an argument that personal jurisdiction is proper because Allman was injured in Illinois as a result of a decision made outside of Illinois that involved Cipicchio. To support this argument, Allman relies on the well-known case of *Gray v. American Radiator and Standard Sanitary Corp.,* for the proposition that "the place of a wrong is where the last event takes place which is necessary to render the actor liable." 176 N.E.2d 761, 763 (Ill.1961). However, this argument misses later development in personal jurisdiction in the Illinois courts. The Illinois Supreme Court has explicitly rejected the contention that the Illinois long-arm statute applies to non-resident defendants whose only contact with Illinois is allegedly causing economic harm within the state. *See R.W. Sawant & Co. v. Allied Programs Corp.,* 489

N.E.2d 1360, 1364 (Ill.1986) (indicating "an economic loss which is felt in Illinois is not sufficient to confer jurisdiction in our courts when the acts occurred outside of Illinois"); *see also Green v. Advance Ross Electronics Corp.,* 408 N.E.2d 1007, 1010 (Ill.App.1980) ("While there may ultimately have been an indirect economic impact in Illinois, we do not believe that this type of tortious consequence, without more, constitutes sufficient contact with this state.").

**\*6** Furthermore, whether Illinois statutory law properly grants jurisdiction is only one part of the inquiry, which at bottom must meet the requirements of federal due process. As indicated above, the actions of Cipicchio cannot be said to indicate that he "purposefully availed" himself to Illinois. When viewed along a "minimum contacts" spectrum, the contact between Cipicchio and Illinois is virtually non-existent and completely unrelated to Allman's claims for relief. This court cannot say that Cipicchio could have reasonably anticipated being haled into court in Illinois as a result of performing his duties for WorldCom outside of Illinois.

Therefore, the court finds that Allman has failed to meet his burden of demonstrating that the court's exercise of personal jurisdiction over Cipicchio is proper as to Count III of the amended complaint.

*C. Fiduciary Shield Doctrine*

Even accepting Allman's syllogism and alternative argument, and assuming *arguendo,* that Allman's claims for relief were sufficiently related to Cipicchio's contacts with Illinois, this court would decline to exercise personal jurisdiction over Cipicchio based on the fiduciary shield doctrine.

"The fiduciary shield doctrine is a judicially created principle that precludes the exercise of personal jurisdiction over non-resident corporate agents or employees who are acting in the forum state in their role as corporate agents or employees." Sonja Larsen, *Validity, Construction, and Application of "Fiduciary Shield" Doctrine–Modern Cases,* 79 A.L.R.5th 587 (2000). The fiduciary shield doctrine is premised on the rationale that it is unfair to force non-resident corporate agents or employees to defend suits brought in a forum where their only relevant contacts are acts performed not for personal benefit but for the benefit of their employer. *Id.* The Illinois Supreme Court recognized the fiduciary shield doctrine in *Rollins v. Ellwood,* 565 N.E.2d 1302, 1317–18 (Ill.1990). In explaining the fiduciary shield doctrine, and its legal underpinnings, the Illinois Supreme Court indicated:

Thus, we find it to be unfair and unreasonable, under Illinois' due process clause and the tenets of our concept of the jurisdictional power of the Illinois courts, to assert personal jurisdiction over an individual who seeks the protection and benefits of Illinois law, not to serve his personal interests, but to serve those of his employer or principal.

*Id.* at 1318. As interpreted by the federal courts in the Northern District of Illinois, "[t]here are three basic limitations on the fiduciary shield doctrine: where the defendant was motivated in part or solely by personal interest, as opposed to the interests of the corporation; where 'the defendant is the alter ego of the entity for which he is a fiduciary;' and, possibly, where the defendant was a director or officer who had discretion regarding whether the contacts occurred." *Robinson v. Sabis Education Systems, Inc.,* No. 98 C 4251, 1999 WL 412642 (N.D.Ill. May 28, 1999) (citations omitted).

 **\*7** Allman has proffered nothing to refute Cipicchio's affidavit, which indicated that Cipicchio did not benefit or serve his personal interests by causing an audit to be performed on Allman's commissions account and freezing Allman's commission bank account. Allman's allegations against Cipicchio, and the Defendants generally, are devoid of specific facts. Allman simply indicated that Cipicchio "knowingly" violated the IWPCA, and "purposefully" and "maliciously" interfered with Allman's employment contract rights. As was aptly stated by the district court in *McMurray:*

"The adverbs 'willfully' and 'maliciously' are too general to describe a personal interest." 2001 WL 561376 at *4. Further, as a vice president in a national corporation, it cannot be argued that Cipicchio is the alter ego of WorldCom. In addition, Allman does not allege that Cipicchio had discretion whether the contacts occurred. In fact, Cipicchio had no relevant contacts with Illinois. Also, Cipicchio's actions were authorized by the Comp Plan, which Allman entered into with WorldCom, and cannot be said to be anything other than Cipicchio performing his duties as an employee of WorldCom in Mississippi.

Furthermore, judicial acceptance of Allman's personal jurisdiction arguments would result in a myriad of officers and directors of corporations being forced to defend themselves in litigation from Seattle to Key West, and every point in between where their corporations transact business, irrespective of their individual contacts with each forum state. Despite the technological advances made that enable the business world to span many borders, such a result would not be consistent with current conceptions of due process guaranteed by the Fourteenth Amendment.

## IV. CONCLUSION

For the foregoing reasons, Defendant, Michael Cipicchio's motion to dismiss Plaintiff, James Allman's complaint for lack of personal jurisdiction brought pursuant to Federal Rule of Civil Procedure 12(b)(2) is granted.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 1811531

Footnotes

1     The court takes the facts from Allman's amended complaint and the parties' briefs and supporting affidavits on the present motion to dismiss for lack of personal jurisdiction. Disputed facts are noted in the text.

2     At a status hearing on April 1, 2003, counsel for Allman advised the court that Defendant, Scott D. Sullivan was served with a summons and a complaint on March 17, 2003. Counsel for Allman also advised the court that Defendant, Kevin D. McGann had not been served.

      The court is deciding the matter before it, as to Defendant, Michael Cipicchio, solely on jurisdictional grounds. As such, the court is not addressing the appropriateness of the complaint in light of the bankruptcy court's stay of Allman's arbitration proceedings or in light of Local Rule 40.4, dealing with reassignment of related cases. In light of this opinion, Allman should be diligent in pursuing this matter as to the remaining Defendants. *See* Fed.R.Civ.P. 11; *see also Berwick Grain Co., Inc. v. Illinois Dept. of Agriculture,* 217 F.3d 502, 504 (7th Cir.2000) (*per curiam* ) (discussing Rule 11 and collecting cases).

2003 WL 1811531

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

Bray v. Lathem Time Co., Slip Copy (2020)

2020 WL 1492742

2020 WL 1492742
Only the Westlaw citation is currently available.
United States District Court, C.D. Illinois,
Springfield Division.

Bret BRAY, individually and on behalf
of all others similarly situated, Plaintiff,
v.
LATHEM TIME CO., Defendant.

Case No. 19-3157
|
Signed 03/26/2020
|
Filed 03/27/2020

**Attorneys and Law Firms**

Ryan F. Stephan, Haley R. Jenkins, Stephan Zouras LLP, Chicago, IL, Brandon Michael Wise, Peiffer Wolf Carr & Kane APLC, St. Louis, MO, for Plaintiff.

Jacob Daniel Radecki, Christopher Graham Dean, McDonald Hopkins LLC, Chicago, IL, for Defendant.

OPINION

RICHARD MILLS, United States District Judge:

 **\*1** This is an action for alleged violations of the Illinois Biometric Information Privacy Act, 740 ILCS 14/1 et seq. ("BIPA").

Defendant moves to dismiss for failure to state a claim and to join necessary parties and to dismiss for lack of personal jurisdiction.

I. BACKGROUND

Defendant Lathem Time Corp. ("Lathem") designs and sells biometric-based timekeeping systems to employers to track time worked by hourly employees. Plaintiff Bret Bray alleges that his former employer, Hixson Lumber Sales of Illinois, Inc. ("Hixson"), required him to use Lathem facial-recognition technology on a timekeeping device (a "Lathem Device") and that Lathem violated BIPA by collecting, storing, using, and/or disclosing his biometric information

without giving the notices and obtaining the consents required by the statute. Bray filed a proposed class action complaint in the Circuit Court for the Fourth Judicial Circuit, Montgomery County, Illinois, seeking to pursue those claims for himself and on behalf of any individual working in Illinois who supposedly had their facial geometries collected, captured, received, obtained, maintained, stored or disclosed by Lathem, regardless of where they worked.

On June 18, 2019, Lathem removed the action to this Court.

Bray alleges Lathem designs and sells biometric timekeeping systems to employers throughout Illinois to track time worked by hourly employees. Because employees clocking in or out must use biometrics—like their facial geometry—this technology eliminates the possibility of "buddy punching" that could occur if a traditional punch card were used. It is not possible to "borrow" facial geometry to clock in for a friend.

BIPA requires collectors of biometric data to inform the subject in writing that biometric data is being collected or stored and receive that person's written consent. See 740 ILCS 14/15(b). If the collector discloses the data, it must generally—absent some exceptions not present here—receive consent for that as well. See 740 ILCS 14/15(d). Additionally, any entity in possession of biometric data must create a publicly accessible policy regarding the retention and destruction of such data. See 740 ILCS 14/15(a).

Bray contends Lathem violated each of those provisions. As an employee from whom Lathem collected facial geometry while ignoring his rights under BIPA, therefore, Bray brings this suit to enforce the statute on his own behalf and on behalf of a class of Illinois citizens whose rights Lathem is alleged to have violated in this way.

Lathem claims BIPA was not designed to apply to third-party technology vendors like itself. Although BIPA may give Bray a cause of action against his employer, Hixson—which he is pursuing in a separate action in state court—it does not give him a claim against Lathem. Lathem contends he is attempting to assert a claim that does not exist. Bray alleges that Lathem collected his data and held it without obtaining his consent. Moreover, Lathem did not establish a retention policy. Bray further contends that BIPA applies to all "private entities" which would include Lathem. Thus, Bray asserts he has alleged a viable claim.

Case: 1:20-cv-00512 Document #: 46-1 Filed: 04/27/20 Page 17 of 29 PageID #:261
**Bray v. Lathem Time Co., Slip Copy (2020)**

2020 WL 1492742

**\*2** Lathem further alleges that, even if Bray could state a claim, the claim should still be dismissed for failure to join numerous necessary parties: the employers of the putative class members. Bray contends this portion of the motion is premature, as there is not sufficient information to determine the necessity of any additional parties under Federal Rule of Civil Procedure 19.

Lathem further asserts it is a Georgia-based seller of workplace timekeeping devices and software services with *de minimis* connections to Illinois. Because of these limited contacts with Illinois and because its suit-related contact is a result of the actions of third parties like Hixson, Lathem claims the action should be dismissed for lack of personal jurisdiction. Bray contends Lathem's business relationships with Illinois citizens, from which his injuries arose, subject it to jurisdiction in Illinois.

## II. DISCUSSION

The Court will first consider Lathem's motion to dismiss for lack of personal jurisdiction because if there is no *in personam* jurisdiction, the Court cannot address the other motion. *See be2 LLC v. Ivanov*, 642 F.3d 555, 557 (7th Cir. 2011) (noting that the entry of a judgment when the court lacks personal jurisdiction over the defendant is void).

### (A)

In considering a motion to dismiss under Rule 12(b)(2), the Court accepts the Plaintiff's allegations concerning personal jurisdiction unless the allegations are refuted through undisputed affidavits. *See Swanson v. City of Hammond*, 411 F. App'x 913, 915 (7th Cir. 2011).

Federal courts sitting in diversity may exercise personal jurisdiction over a nonresident defendant only if the forum-state court would have such jurisdiction. *See Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2012). "Because Illinois permits personal jurisdiction if it would be authorized by either the Illinois Constitution or the United States Constitution, the state statutory and federal constitutional requirements merge." *uBid, Inc. v. GoDaddy Group, Inc.*, 623 F.3d 421, 425 (7th Cir. 2010). Under the Constitution, the inquiry is whether it is "fair and reasonable" to require the nonresident defendant to answer the plaintiff's claim; the entity must have contacts or ties with the state "such that

maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). A defendant must purposefully avail itself of the privilege of conducting activities within a state, thereby invoking the protection of its laws. *See Burger King Co. v. Rudzewicz*, 471 U.S. 462, 474-75 (1985). The contacts must create a "substantial connection" with the state and not be the result of "random," "fortuitous" or "attenuated" contacts. *Id.* at 475.

The plaintiff cannot be the sole link between a defendant and the forum. *See Walden v. Fiore*, 571 U.S. 277, 285 (2014). While "a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties," its "relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Id.* at 286.

### (B)

The issue is whether Illinois has specific jurisdiction over Lathem. In order for there to be specific jurisdiction, "the defendant's contacts with the forum state must show that it purposefully availed itself of the privilege of conducting business in the forum state or purposefully directed its activities at the state." *Lexington Insurance Company v. Hotai Insurance Co., Ltd.*, 938 F.3d 874, 878 (7th Cir. 2019) (internal quotation marks omitted). Next, "the plaintiff's alleged injury must have arisen out of the defendant's forum-related activities." *Id.* Additionally, "any exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice." *Id.*

**\*3** The Seventh Circuit has cautioned that courts "should be careful in resolving questions about personal jurisdiction involving online contacts to ensure that a defendant is not haled into court simply because the defendant owns or operates [an interactive] website that is accessible in the forum state." *Matlin v. Spin Master Corp.*, 921 F.3d 701, 706 (7th Cir. 2019) (citations omitted). The minimum-contacts analysis "center on the relations among the defendant, the forum, and the litigation." *Id.* In order for there to be personal jurisdiction, the defendants must have targeted the forum state. *See id.* Lathem's "suit related conduct must create a substantial connection with the forum State" in order for there to be personal jurisdiction. *See Walden*, 571 U.S. at 284.

Case: 1:20-cv-00512 Document #: 46-1 Filed: 04/27/20 Page 18 of 29 PageID #:262
Bray v. Lathem Time Co., Slip Copy (2020)

2020 WL 1492742

In support of its motion to dismiss for lack of personal jurisdiction, Lathem has submitted the Declaration of Lance Whipple, its Vice President, Sales & Marketing. When a defendant submits evidence disputing a court's exercise of personal jurisdiction, the plaintiff must provide evidence supporting the court's exercise of jurisdiction. See *Matlin*, 921 F.3d at 705.

Lathem contends it does not have sufficient contacts with Illinois to justify the exercise of specific jurisdiction. Moreover, Lathem alleges its sales and interactive website are irrelevant to the jurisdictional analysis.

According to Mr. Whipple's Declaration, Lathem has no offices or facilities in Illinois. It is not registered to do business in Illinois and has no Illinois employees. Lathem has no real estate, accounts, other personal property or physical presence of any kind in Illinois. Lathem does not interact with its customers' employees, such as Bray or any putative class members. Its relationship is solely with the employers.

Lathem alleges it does not target Illinois customers or their employees in any way. Mr. Whipple states Lathem does not advertise in Illinois, send sales or other representatives here, maintain any sales or marketing programs for Illinois customers, or geographically restrict the sales of its products and services. Lathem's suit-related "contact" is limited to offering an optional web-service, PayClock Online, that is available to customers in Illinois. "If the defendant merely operates a website, even a "highly interactive" website, that is accessible from, but does not target, the forum state, then the defendant may not be haled into court in that state without offending the Constitution." *be2 LLC*, 642 F.3d at 559.

Lathem notes it did not itself create any contact with Illinois. It is the result of decisions by employers to (1) use Lathem Devices in the state, (2) enable the facial-recognition feature, and (3) enroll in PayClock Online. The absence of any one of these decisions by the employers would break the chain of events that led to suit-related contact with Illinois. As Mr. Whipple states, Lathem did not even sell the Lathem Device to Bray's employer, Hixson Illinois; instead it sold and shipped them to Hixson Lumber Sales in Arkansas. Whipple notes that customers can move and use the devices as they see fit, including across state lines. Accordingly, Lathem had nothing to do with how the devices got to Illinois. As Lathem alleges, its contact with Bray is purely happenstance and the result of the actions of third parties. Such "random," "fortuitous" or "attenuated" contacts—which is based solely on the actions of another entity—cannot support specific jurisdiction. See *Burger King*, 471 U.S. at 475.

Bray claims that Lathem could reasonably foresee that its products and services would be purchased and used in Illinois. Citing *Illinois v. Hemi Group LLC*, 622 F.3d 754 (7th Cir. 2010), Bray contends that Lathem's business appears to include an expansive and sophisticated online venture and, when an entity holds itself out to conduct business nationwide and is successful in reaching nationwide customers, personal jurisdiction exists. See *id.* at 760. In *Hemi Group*, the Seventh Circuit found significant that the online seller expressly stated that it would do business with 49 states by saying it would ship to any state in the country except New York. See *id.* at 758 ("Although listing all forty-nine states by name would have made a stronger case for jurisdiction in this case, inasmuch as it would have expressly stated that Hemi wanted to do business with Illinois residents, the net result is the same."). Mr. Whipple states that Lathem imposes no such limitation on its sales. Additionally, the issue in *Hemi Group* concerned the defendant's failure to pay sales tax, see 622 F.3d at 756, so the sale itself was a suit-related contact. This lawsuit concerns Lathem's alleged collection, storage use and disclosure of biometrics--not Lathem's sales.

**\*4** Bray cites *uBID, Inc. v. GoDaddy Group, Inc.*, 623 F.3d 421 (7th Cir. 2010) for the proposition that the Seventh Circuit found that personal jurisdiction existed based on Internet-based activities. The defendant in that case had aired many national commercials, including six straight years of Super Bowl ads. See *id.* at 427. Its advertising activities included celebrity and sports sponsorships which successfully reached Illinois customers. See *id.* Lathem has not targeted Illinois in a remotely similar manner. Accordingly, *uBid* is inapposite.

Bray also relies on *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Associates of Houston Metroplex, P.A.*, 623 F.3d 440 (7th Cir. 2010), wherein the Seventh Circuit states that "[a] defendant's deliberate and continuous exploitation of the market in a forum state, accomplished through its website as well as through other contacts with the state, can be sufficient to establish specific personal jurisdiction." *Id.* at 446. In this case, however, there are no contacts with the state other than the website and that alone is not enough. See *id.* ("A plaintiff cannot satisfy the *Calder* standard simply by showing that the defendant maintained a website accessible to residents of the forum state and alleging that the defendant caused harm through that website.").

Bray also relies on *Norberg v. Shutterfly, Inc.*, 152 F. Supp.3d 1103 (N.D. Ill. 2015), wherein the plaintiff also asserts a violation of BIPA. Judge Norgle noted that defendants in *Norberg* operated multiple websites that provided digital photo storage, sharing, and photo prints and novelty gifts, such as photo mugs and mousepads, which was available in all 50 states and internationally. *See id.* at 1105. The photo sharing and printing services were offered directly to Illinois citizens, while hard copy photographs and other products were shipped directly to their customers. *See id.* The alleged statutory violation stemmed out of the defendants' contact with Illinois residents. *See id.* Accordingly, the court denied the defendants' motion to dismiss for lack of personal jurisdiction. *See id.* This case is distinguishable because Lathem's only "contact" with Illinois occurs when its customers—employers, not end users—reach out to purchase its products and services. Bray's and the putative class members' injury stems not from that contact but from the employers' subsequent use of Lathem Devices, which take place wherever and in whatever manner the employers choose. Accordingly, the injury here does not stem from Lathem's Illinois contacts and does not establish specific jurisdiction.

The Court concludes Bray has failed to rebut Lathem's evidence demonstrating the lack of personal jurisdiction. Lance Whipple's Declaration noted that Lathem is incorporated and headquartered in Georgia; does not have any real estate, accounts, personal property, employees, or physical presence in Illinois; does not target Illinois or

purposely directly sales into the state through advertising and marketing or the use of sales or service representatives; and did not even sell a Lathem Device to Bray's employer in Illinois. Because Bray has not refuted Mr. Whipple's statements, the Court accepts those statements as true. *See GCIU-Employer Retirement Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1020 n.1 (7th Cir. 2009) ("[W]e accept as true any facts contained in the defendant's affidavits that remain unrefuted by the plaintiff.").

Based on the random and attenuated nature of Lathem's contacts with Illinois—and the lack of any suit-related contact--the Court concludes that personal jurisdiction over Lathem would not comport with traditional notions of fair play and substantial justice. Accordingly, Lathem does not have sufficient contacts with Illinois to warrant the exercise of specific jurisdiction.

**\*5** Ergo, the motion of Defendant Lathem Time Corp to dismiss for lack of personal jurisdiction [d/e 14] is GRANTED.

The Clerk will terminate the Defendant's motion to dismiss for failure to state a claim [d/e 9].

The Clerk will enter Judgment and terminate this case.

**All Citations**

Slip Copy, 2020 WL 1492742

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Egan v. Huntington Copper, LLC, Not Reported in F.Supp.3d (2014)

2014 WL 585316

2014 WL 585316
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Julia Egan, Plaintiff,

v.

Huntington Copper, LLC, Huntington Copper
Moody MacGuire, HCMM, Inc., Patrick
MacGuire, David Pineda, Robert Popkey,
Williams Shapcott, and John Morris, Defendants.

12 C 9034
|
Filed February 14, 2014

**Attorneys and Law Firms**

Matthew J. Blit, Levine & Blit, P.L.L.C., New York, NY,
Daniel R. Griffin, O'Connell Tivin Miller & Burns, LLC,
Chicago, IL, Lewis G. Spicer, Levine & Blit, PLLC Syracuse,
NY, for Plaintiff.

David Pineda, Coral Springs, FL, pro se.

Jennifer Anne Naber, Laner Muchin, Ltd., Chicago, IL, Gary
J. Wojtan, Wojtan, Vallone & Melin, P.C., Cheektowaga, NY,
Ryan D. Johnson, Johnson & Harris, LLC, Buffalo Grove, IL,
for Defendant.

*MEMORANDUM OPINION AND ORDER*

Gary Feinerman, United States District Judge

**\*1** Julia Egan brought this employment suit against several
defendants. One of the defendants, David Pineda, who is *pro
se,* filed a motion to dismiss for lack of personal jurisdiction
and for failure to state a claim under Federal Rules of Civil
Procedure 12(b)(2) and 12(b)(6). Doc. 19. The court deemed
the motion to be not only a motion to dismiss, but also a
motion to vacate a technical default against Pineda. Doc. 20
(Conlon, J.). After the case was reassigned to the undersigned
judge, the court granted the motion to the extent it sought
to vacate the technical default and entered and continued the
motion otherwise. Doc. 54.

The court now considers the portion of the motion that
seeks dismissal under Rule 12(b)(2) for lack of personal

jurisdiction. A federal court's "exercise of jurisdiction over
the defendant must be authorized by the terms of the forum
state's personal jurisdiction statute and also must comport
with the requirements of the Fourteenth Amendment's Due
Process Clause." *Felland v. Clifton,* 682 F.3d 665, 672
(7th Cir. 2012). The Illinois long-arm statute permits a
court to exercise personal jurisdiction "on any ... basis now
or hereafter permitted by the Illinois Constitution and the
Constitution of the United States." 735 ILCS 5/2–209(c).
Because "there is no operative difference between these two
constitutional limits," a federal court sitting in Illinois and
evaluating a Rule 12(b)(2) motion asks "whether the exercise
of personal jurisdiction would violate federal due process."
*Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs.
of Houston Metroplex, P.A.,* 623 F.3d 440, 443 (7th Cir. 2010)
(citations omitted).

"Under the Supreme Court's well-established interpretation of
the Fourteenth Amendment's due process clause, a defendant
is subject to personal jurisdiction in a particular state only
if the defendant had certain minimum contacts with it such
that the maintenance of the suit does not offend traditional
notions of fair play and substantial justice." *Ibid.* (internal
quotation marks omitted). The Supreme Court has "framed
the constitutional inquiry in terms of whether the defendant
purposefully avails itself of the benefits and protections
of conducting activities in the forum state." *Id.* at 444
(internal quotation marks omitted). To be subject to personal
jurisdiction, "[t]he defendant's contacts must not be merely
random, fortuitous, or attenuated; rather, the 'defendant's
conduct and connection with the forum state' must be such
that it should 'reasonably anticipate being haled into court
there.' " *Citadel Grp. Ltd. v. Wash. Reg. Med. Ctr.,* 536
F.3d 757, 761 (7th Cir. 2008) (quoting *Burger King Corp. v.
Rudzewicz,* 471 U.S. 462, 474–75 (1985)).

"Personal jurisdiction can be general or specific, depending
on the extent of the defendant's contacts." *Mobile
Anesthesiologists Chicago,* 623 F.3d at 444. Egan pursues
only a theory of general jurisdiction against Pineda, Doc. 21
at 7–9, and therefore has forfeited any argument that specific
jurisdiction lies over him. *See RAR, Inc. v. Turner Diesel,
Ltd.,* 107 F.3d 1272, 1277 (7th Cir. 1997) ("RAR has never
alleged that Turner has such systematic contacts with Illinois.
RAR has thus waived any general jurisdiction argument, and
we may focus exclusively on specific jurisdiction.") (citation
omitted). "A defendant is subject to general jurisdiction when
it has 'continuous and systematic general business contacts'
with the forum state." *uBID, Inc. v. GoDaddy Grp., Inc.,*

623 F.3d 421, 425 (7th Cir. 2010) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 415–16 (1984)). "This is a demanding standard," *id.* at 426, that "requires that the defendant be 'essentially at home' in the forum." *Abelesz v. OTP Bank,* 692 F.3d 638, 651 (7th Cir. 2012) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 131 S.Ct. 2846, 2851 (2011)).

**\*2** Although factual disputes are resolved in the plaintiff's favor on a Rule 12(b)(2) motion, "once the defendant has submitted affidavits or other evidence in opposition to the exercise of jurisdiction, the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Purdue Research Found. v. Sanofi–Synthelabo, S.A.,* 338 F.3d 773, 783 (7th Cir. 2003) (footnote omitted). Egan was employed by one or more of the entity defendants—the parties dispute the identity of Egan's employer(s), but there is no need to resolve the dispute for purposes of this motion—in California. Doc. 1 at ¶ 22. The complaint alleges that Pineda had an "ownership interest in Huntington [the term Egan uses to describe her employer], maintain[ed] day-to-day control over [Egan's] activities, and maintain[ed] control over the essential functions of the business." *Id.* at ¶ 12. Egan's brief asserts that "Pineda personally and through his agents acting upon his behalf and at his direction, had continuous and systematic contact with the State of Illinois during 2011, as they were making sales, soliciting sales, and providing business consulting services to business [sic] within Illinois out of the LLC's office located in Deer Park, Illinois." Doc. 21 at 8. To support this assertion, Egan submits several exhibits: Huntington's registrations with the North Carolina and Illinois Secretaries of State showing that it was registered in North Carolina, that its principal place of business was Ohio, and that it had an agent in Illinois, Doc. 22–1 at 1–2; Doc. 22–4; and Better Business Bureau printouts showing Huntington had an office in Illinois and that complaints were filed against it by Illinois customers in 2011, Doc. 22–2 at 1–2; Doc. 22–3 at 1–2.

Given these materials, as well as Pineda's admission that Huntington was "authorized to do business in almost every state" and did a "small fraction of [its] business" in Illinois, Doc. 19 at 2–3, 10 (¶ 4), Egan has established that *Huntington* had contacts in Illinois. But the question here concerns *Pineda's* contacts with Illinois. On that subject, Pineda submits an affidavit averring that he has lived in Florida for the past ten years and in Pennsylvania before then, and that during Pineda's eighteen-month tenure at Huntington, he commuted from Florida to Huntington's headquarters in

Ohio, where his primary responsibility was the day-to-day supervision of the Analysis Department. Doc. 19 at 9–10 (¶¶ 2–3).

In an effort to counter Pineda's evidence and support her submission that Pineda "resided in Illinois," Doc. 21 at 8, Egan frivolously argues that records obtained from the Cook County Recorder of Deeds show that "David Pineda" owns "four residential properties in Chicago, Illinois; one residential property in Oak Forest, Illinois; and one residential property in Lynwood, Illinois at various times throughout the last several decades, including the present." Doc. 21 at 5. Those records fall far short of qualifying as "affirmative evidence" that our David Pineda lived in Illinois. *Purdue Research Found.,* 338 F.3d at 783. The records show only that properties in Illinois are owned by one person or some people named "David Pineda." Doc. 29 at 5. "David Pineda" is not an uncommon name; a search of www.whitepages.com (visited Feb. 14, 2014) shows that several David Pinedas reside in Illinois and that several dozen live in the United States. Egan provides no basis whatsoever to conclude or even suspect that one of the David Pinedas (or the David Pineda) who owns property in Illinois is our David Pineda.

Egan alternatively and implicitly suggests that the Huntington's contacts in Illinois should be imputed to Pineda for purposes of deciding whether general jurisdiction lies over Pineda. Doc. 21 at 8–9. This suggestion is contrary to settled precedent holding that a business's contacts cannot be attributed to individual officers or directors for purposes of determining whether personal jurisdiction lies over the individuals. *See Young v. Colgate–Palmolive Co.,* 790 F.2d 567, 569–70 (7th Cir. 1986) ("the individual board members cannot be said to have transacted business within Illinois merely because the corporation is qualified to do business here") (citing *Mergenthaler Linotype Co. v. Leonard Storch Enters., Inc.,* 383 N.E.2d 1379, 1385 (Ill.App.1978) (The "plaintiff ... has apparently assumed that if jurisdiction is found as to the [corporation] ... it must automatically follow that jurisdiction exists as to the claim against [the president]. But this is not so.... Any transaction of business with Illinois residents was by the corporation and not by the employee individually.") (alterations in original)); *W. Va. Laborers Pension Trust Fund v. Caspersen,* 829 N.E.2d 843, 849 (Ill.App.2005) ("As in *Mergenthaler* and *Young,* personal jurisdiction must be established by the individual employee's acts and not the acts of the corporation."); *Olinski v. Duce,* 508 N.E.2d 398, 400 (Ill.App.1987) ("A conclusion that a foreign corporation is subject to Illinois jurisdiction

does not require the further conclusion that an employee, shareholder, president, or member of the board of directors of that corporation is also subject to Illinois jurisdiction."); *Continental Cas. Co. v. Marsh,* 2002 WL 31870531, at *6 (N.D.Ill.Dec. 23, 2002) (holding that a company's contacts in Illinois "do[ ] not establish that [the defendant], as opposed [the company], had any personal ties to Illinois"); *Berg v. Anderson,* 1995 WL 476671, at *5 (N.D. Ill. Aug 8, 1995) ("However, Anderson, who is sued individually, must be distinguished from the corporation of which he is an officer and a majority shareholder. None of the materials submitted to the Court indicate that Anderson has sufficient systematic and continuous contacts with the State of Illinois such that he might reasonably anticipate being haled into court in Illinois.") (footnote omitted).

**\*3** Egan's invocation of the fiduciary shield doctrine, Doc. 21 at 9, fares no better. The doctrine prevents a court assessing whether personal jurisdiction lies over an agent from considering contacts that agent made in the State on behalf of his or her employer. *See ISI Int'l, Inc. v. Borden Ladner Gervais LLP,* 256 F.3d 548, 550 (7th Cir. 2001) ("Illinois employs the fiduciary-shield doctrine, under which a person who enters the state solely as fiduciary for another may not be sued in Illinois.") (citation omitted); *Rollins v. Ellwood,* 565 N.E.2d 1302, 1318 (Ill.1990) (deeming it "unfair and unreasonable ... to assert personal jurisdiction over an individual who seeks the protection and benefits of Illinois law, not to serve his personal interests, but to serve those of his employer or principal"). Egan correctly argues that doctrine generally does not apply to shareholders and owners of companies because they act in their personal interest while pursuing their company's business. *See Elsner v. Brown,* 996 N.E.2d 84, 95–97 (Ill.App.2013); *Fountain Marketing Grp., Inc. v. Franklin Progressive Resources, Inc.,*

1996 WL 406633, at *4 (N.D.Ill. Aug. 22, 1996) ("The fiduciary shield defense does not apply if the employee in question was also (or instead) acting to 'serve his personal interests.' For example, an individual who is a high-ranking company officer or shareholder has a direct financial stake in the company's health and can be subjected to personal jurisdiction for actions that result in both personal and corporate benefit.") (citing *Rice v. Nova Biomedical Corp.,* 38 F.3d 909, 912–13 (7th Cir. 1994)). But the doctrine plays no role where, as here, the shareholder or owner (Pineda) has no contacts with the forum (Illinois) in the first place. *See Flexicorps, Inc. v. Benjamin & Williams Debt Collectors, Inc.,* 2007 WL 1560212, at *3 (N.D.Ill. May 29, 2007) ("In order for the fiduciary shield doctrine to apply, the individual first must have minimum contacts with the forum state sufficient to establish personal jurisdiction.... Plaintiff cannot use the fiduciary shield doctrine to expand this Court's exercise of personal jurisdiction—the fiduciary shield is just that, a shield, not a sword.").

For the foregoing reasons, Pineda's Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction is granted. The claims against Pineda are dismissed without prejudice. *See Sikhs for Justice v. Badal,* 736 F.3d 743, 751 (7th Cir. 2013) ("Ordinarily a dismissal for want of personal jurisdiction as a result of improper service is without prejudice, leaving the plaintiff free to refile the suit and seek to serve the refiled complaint on the defendant."). This disposition makes it unnecessary to resolve Pineda's Rule 12(b)(6) motion to dismiss for failure to state a claim, which is denied without prejudice as moot.

## All Citations

Not Reported in F.Supp.3d, 2014 WL 585316

---

**End of Document**
© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 245910
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Frederick William Gullen, on behalf of himself
and all others similarly situated, Plaintiff,

v.

Facebook.com, Inc., Defendant.

No. 15 C 7681
|
Signed 01/21/2016

**MEMORANDUM OPINION AND ORDER**

HON. JORGE L. ALONSO, United States District Judge

**\*1** Plaintiff sues defendant for its alleged violations of the Illinois Biometric Information Privacy Act ("BIPA"), 740 Ill. Comp. Stat. 14/1 et seq. Defendant has filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) and (6) for lack of personal jurisdiction and failure to state a claim. For the reasons set forth below, the Court grants in part and strikes as moot in part the motion.

**Facts**

Facebook is a Delaware corporation with its principal place of business in California. (Compl. ¶ 8.) Plaintiff is a citizen of Illinois who does not use Facebook. (Id. ¶ 7.)

Plaintiff contends that Facebook obtained his biometric data from a photo that was uploaded by a third party to Facebook. It did so by using facial recognition technology, which "scans every user-uploaded photo for faces, extracts...[the] biometric identifiers of each face, and then uses that data to create and store a template of each face." (Id. ¶ 22.) Facebook's "tag suggestion" feature, "which prompts a user to 'tag' a preselected name to a particular face," compares the face templates of people in newly-uploaded photos with the face templates already saved in Facebook's database. (Id. ¶ 24.) "If no match is found, the user is prompted to 'tag' (i.e., identify by name) a person to that face, at which point the face template and corresponding name identification are saved in Facebook's face database. However, if a face template is

generated that matches a face template already in Facebook's face database, then Facebook suggests that the user 'tag' to that face the name already associated with [it]." (Id.)

When the photo of plaintiff was uploaded, "Facebook automatically scanned and analyzed Plaintiff's face, extracted his biometric identifiers..., and then used those biometric identifiers to create a template of his face." (Id. ¶ 30.) Facebook then asked the person who uploaded the photo to "tag" plaintiff's face, "at which point the [person] tagged the name 'Frederick W. Gullen' to Plaintiff's face." (Id. ¶ 31.)

Plaintiff, who never gave Facebook his permission to collect or store any biometric information about him, alleges that Facebook's actions violate BIPA. (Id. ¶ 33.) Defendant contends that the Court lacks personal jurisdiction over it and that, even if jurisdiction exists, the BIPA claim fails on its merits.

**Discussion**

**Personal Jurisdiction**

Federal courts sitting in diversity may exercise personal jurisdiction over a nonresident defendant only if the forum-state court would have such jurisdiction. Hyatt Int'l Corp. v. Coco, 302 F.3d 707, 713 (7th Cir. 2002). Illinois courts can "exercise jurisdiction on any...basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 Ill. Comp. Stat. 5/2-209(c). Because the state and federal standards are not substantively different, Hyatt, 302 F.3d at 715, the Court will address only the federal.

Plaintiff argues that the Court has specific personal jurisdiction over Facebook.[1] That is true only if Facebook has " 'certain minimum contacts' with [Illinois] such that the 'maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc., 751 F.3d 796, 801 (7th Cir. 2014) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)) (quotation omitted). For specific jurisdiction:

**\*2** The relevant contacts are those that center on the relations among the defendant, the forum, and the litigation. Id. [Walden v. Fiore, ___ U.S. ___, 134 S. Ct. 1115, 1119 (2014)] (citing Keeton v. Hustler Mag., Inc., 465 U.S. 770, 775, 104 S. Ct. 1473, 79 L. Ed. 2d 790 (1984)). Crucially, not just any contacts will do: "For a State

2016 WL 245910

to exercise jurisdiction consistent with due process, the defendant's *suit-related* conduct must create a substantial connection with the forum State." *Id.* at 1121 (emphasis added). The "mere fact that [defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction." *Id.* at 1126. Furthermore, the relation between the defendant and the forum "must arise out of contacts that the 'defendant *himself*' creates with the forum...." *Id.* at 1122 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)). Contacts between the plaintiff or other third parties and the forum do not satisfy this requirement. *Id.*; *see Walden*, 134 S. Ct. at 1122.

*Id.*; *see Walden*, 134 S. Ct. at 1122 ("We have consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State.") (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984)).

According to the complaint, Facebook's contacts with Illinois are that it is registered to do business here, has a sales and advertising office here, and "target[s] its facial recognition technology to millions of users who are residents of Illinois." (Compl. ¶ 10.) The first two contacts have no relationship to this suit, which arises from Facebook's alleged collection of biometric data from a photo, not from its sales, marketing, or other business activity in Illinois. The third alleged contact, as the factual allegations of plaintiff's complaint illustrate, is not true. Plaintiff alleges that Facebook uses facial recognition technology on "every user-uploaded photo," not just on photos uploaded in or by residents of Illinois. (Compl. ¶ 22.) Given this tacit admission that Facebook's alleged collection of biometric information is not targeted at Illinois residents, the third "contact" becomes simply that Facebook operates an interactive website available to Illinois residents.

The Court has not found a case analyzing specific jurisdiction over a social media website. However, the Seventh Circuit has rejected the notion that an online merchant's operation of an interactive site is sufficient to confer specific jurisdiction on it in every state from which the site can be accessed:

> The interactivity of a website is...a poor proxy for adequate in-state contacts. We have warned that "[c]ourts should be careful in resolving questions about personal jurisdiction involving online contacts to ensure that a defendant is not haled into court simply because the defendant owns or

operates a website that is accessible in the forum state, even if that site is 'interactive.' " *be2 LLC*, 642 F.3d at 558 (citing *Illinois v. Hemi Grp., LLC*, 622 F.3d 754, 760 (7th Cir. 2010)). This makes sense; the operation of an interactive website does not show that the defendant has formed a contact with the forum state. And, without the defendant's creating a sufficient connection (or "minimum contacts") with the forum state itself, personal jurisdiction is not proper.

> ....Having an "interactive website" (which hardly rules out anything in 2014) should not open a defendant up to personal jurisdiction in every spot on the planet where that interactive website is accessible.

*Advance Tactical*, 751 F.3d at 803; *see be2 LLC v. Ivanov*, 642 F.3d 555, 558-59 (7th Cir. 2011) ("Beyond simply operating an interactive website that is accessible from the forum state, a defendant must in some way target the forum state's market. If the defendant merely operates a website, even a 'highly interactive' website, that is accessible from, but does not target, the forum state, then the defendant may not be haled into court in that state without offending the Constitution.") (citations omitted). Because plaintiff does not allege that Facebook targets its alleged biometric collection activities at Illinois residents, the fact that its site is accessible to Illinois residents does not confer specific jurisdiction over Facebook.

**\*3** The result is the same if, as plaintiff seems to urge, this case is viewed as an intentional tort. The requirements for specific jurisdiction in such a case are: (1) intentional conduct...; (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt–that is, the plaintiff would be injured–in the forum state." *Tamburo v. Dworkin*, 601 F.3d 693, 703 (7th Cir. 2010) (citations omitted); *see Walden*, 134 S. Ct. at 1123 ("In [the] context [of intentional torts], it is...insufficient to rely on a defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff. A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum.") (quotation omitted). As noted above, plaintiff alleges that Facebook uses the tag suggestions and facial recognition software on all uploaded photos, not just those uploaded in or by residents of Illinois. Moreover, plaintiff does not, and could not plausibly, allege that Facebook knew an Illinois resident would upload a photo of him and tag his name to it, thereby (allegedly) giving Facebook access to plaintiff's biometric information. Thus,

even if the *Tamburo* test applies here, plaintiff has not satisfied it. [2]

In short, plaintiff has not made a prima facie showing that the Court has specific jurisdiction over Facebook. *See Tamburo, 601 F.3d at 700* (when the issue of personal jurisdiction is decided on the basis of written materials, plaintiff must only make a prima facie case of personal jurisdiction) (citing *Purdue Research Found. v. Sanofi-Synthelabo, S.A., 338 F.3d 773, 782 (7th Cir. 2003)*). Therefore, the Court grants Facebook's motion to dismiss for lack of personal jurisdiction.

**Conclusion**

For the reasons set forth above, the Court grants in part and strikes as moot in part Facebook's Rule 12(b)(2) and (6) motion to dismiss [18]. The Court grants the portion of the motion seeking dismissal for lack of personal jurisdiction and strikes as moot the portion seeking dismissal for failure to state a claim. Plaintiff's motion to appoint interim co-lead class counsel [33] is stricken as moot. Civil case terminated.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 245910

Footnotes

1    Plaintiff does not argue that general jurisdiction exists.

2    The fact that plaintiff sustained the alleged injury in Illinois "is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State. The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Walden, 134 S. Ct. at 1125*.

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3452381
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

SCAROLA ELLIS LLP, Plaintiff,

v.

SKYWORKS VENUTRES, INC. and
Skyworks Interactive, Inc., Defendants.

No. 09 Civ. 10003(DLC).
|
Sept. 1, 2010.

**Attorneys and Law Firms**

Richard J.J. Scarola, Scarola Ellis LLP, New York, NY, for
Plaintiff.

Craig H. Kuglar, Krevolin & Horst, LLC, Atlanta, GA, for
Defendant.

*OPINION & ORDER*

DENISE COTE, District Judge.

 **\*1**  This action arises out of the efforts of plaintiff Scarola
Ellis LLP ("Scarola"), a New York law firm, to recoup certain
fees that it alleges a New Jersey-based client has not paid.
The defendants have moved to dismiss the action or, in the
alternative, to transfer the action pursuant to 28 U.S.C. §
1404(a) to New Jersey. For the following reasons, the motion
is granted in part.

BACKGROUND

Defendant Skyworks Ventures, Inc., f/k/a "Anedom
Company, Inc." ("Ventures") is a Delaware corporation with
its principal place of business in New Jersey. Defendant
Skyworks Interactive, Inc. ("Interactive" and together with
Ventures, the "defendants"), a wholly-owned subsidiary of
Ventures, is a New Jersey corporation with its principal place
of business in New Jersey. Ventures acquired Interactive's
predecessor-in-interest in December 2007. [1]

Interactive sells applications ("apps") for various platforms,
*e.g.*, the Apple iPhone and Nintendo, who, in turn, sell these

apps to third parties. Interactive does not make any direct sales
to any entity or customer in New York. None of Interactive's
geographically-targeted advertising has ever been directed
at New York and Interactive is not registered to transact
business in New York. Neither Ventures nor Interactive has
any office in New York; owns, leases, or has any property,
real or personal, in New York; has any employee or any direct
customers in New York. None of Ventures' or Interactive's
revenues come directly from New York.

On June 4, 2007, Ventures signed a retainer agreement with
Scarola to assist with its capital raising efforts. Interactive,
which did not even exist at the time, was not a party
to the retainer agreement. Between June 2007 and July
2009, Scarola invoiced Ventures approximately $1.2 million
for legal services. All invoices from Scarola were sent to
Ventures and referenced Ventures as the client. Interactive
never executed an engagement letter with Scarola, or paid any
monies to Scarola. Ventures ceased paying its bills in a timely
way sometime in early 2009. Ventures claims that it has paid
Scarola approximately $921,896 in legal fees.

On September 30, 2009, Scarola filed a complaint against
Ventures and Interactive in the Southern District of New York.
*See Scarola Ellis LLP v. Skyworks Ventures Inc.,* No. 09 Civ.
8309(DLC) (S.D.N.Y. filed Sept. 30, 2009). The case was
assigned to this Court. After the defendants were granted
two extensions of time to respond to the complaint—once
at the behest of the defendants, the other by stipulation of
the parties-Scarola dismissed its claims without prejudice
on December 1, three days before defendants were due to
respond and, apparently, file counterclaims against Scarola.

Six days later, on December 7, Scarola re-filed the identical
complaint against the defendants. *See Scarola Ellis LLP v.
Skyworks Ventures Inc.,* No. 09 Civ. 10003(DLC) (S.D.N.Y.
filed Dec. 7, 2009). Scarola admits that it "determined to re-
file the action—this case-so as to be sure no preemptive action
was filed against it in a different jurisdiction." On December
14, this case was accepted as related to No. 09 Civ. 8309.
From December 7, 2009 to March 31, 2010 (114 days after
filing), Scarola took no steps to serve the complaint on either
Ventures or Interactive.

 **\*2**  By letter dated March 31, Scarola advised this Court that
"an involuntary bankruptcy petition has been filed against
the *defendants* in this case" in the District of New Jersey
on March 31. Scarola was not initially a petitioning creditor
against Interactive, but later joined the petition against

Interactive on May 3. Scarola requested that the Rule 16 pretrial conference in this action, scheduled for April 2, be adjourned. Scarola's request was granted and the parties were directed to submit a status letter by September 15. Scarola now admits that its March 31 letter was incorrect and misleading. Scarola was aware at the time that the involuntary bankruptcy petition had been filed only against Interactive, not Ventures. Scarola has "apologize[d]" to the Court and admitted that it "should have written a clarification or correction to this Court."

On May 11 (155 days after the complaint was filed), Scarola filed an involuntary bankruptcy petition against Ventures in the District of New Jersey. On May 14, Ventures, but not Interactive, filed a lawsuit against Scarola in New Jersey state court (the "New Jersey action"). In the New Jersey action, Ventures alleges, *inter alia,* that Scarola over billed Ventures for its services and breached its fiduciary duties to Ventures by, among other things, using Ventures' proprietary investor lists to solicit business for itself. On May 21, Scarola filed a notice of removal of the New Jersey action to United States District Court for the District of New Jersey, where the case is currently pending.

On June 7, the bankruptcy court overseeing the involuntary bankruptcy petitions against Interactive and Ventures, dismissed the petition against Interactive. Scarola never advised this Court of the dismissal. On June 14, Scarola purportedly served the summons and complaint against Interactive on Sharon Fordham ("Fordham"), a director of both Ventures and Interactive, at her office. According to Fordham, the process server "handed [her] papers without identifying them and told [her] to give them to Tom Fordham." Thomas Fordham is Sharon's husband and is also a director of both Ventures and Interactive. Fordham "sign[ed] a sheet acknowledging receipt."

On June 28, the bankruptcy court dismissed the involuntary bankruptcy petition filed by Scarola against Ventures. Scarola did not advise this Court of the dismissal. On July 1, Scarola purportedly served the summons and complaint on Ventures. On July 15, the bankruptcy court found that Scarola had filed the petition against Ventures "in bad faith in a two-party dispute as a litigation tactic to force a settlement" and held that punitive damages would be awarded after hearing further evidence. *See In re Skyworks Ventures, Inc.,* 431 B.R. 573, 574 (Bankr.D.N.J.2010). Specifically, the bankruptcy court found that Scarola's petition

was an attempt to force Ventures to settle the disputed claim of Scarola Ellis by impeding the dismissal of the Interactive case and throwing Ventures into bankruptcy. This was a litigation tactic that Scarola Ellis hoped would shortcut the suit in the District Court where they anticipated a defense and counterclaim would be filed if they served the summons and complaint.

**\*3** *Id.* at 579. A hearing on punitive damages is scheduled in the bankruptcy court for September 8.

On July 6, the defendants filed the instant motion to dismiss or transfer the action pursuant to the District of New Jersey. The motion became fully submitted on July 30.

DISCUSSION

1. Ventures
The complaint must be dismissed against Ventures pursuant to Rule 4(m), Fed.R.Civ.P. Rule 4 provides in pertinent part:

> If a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff-must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed.R.Civ.P. 4(m); *Zapata v. City of New York,* 502 F.3d 192, 195 (2d Cir.2007).

Scarola concedes that it did not serve Ventures within 120 days of filing the complaint. The complaint was filed on December 7, 2009. While the action was automatically stayed against Interactive pursuant to the involuntary bankruptcy

2010 WL 3452381

petition filed in the District of New Jersey on March 31, 2010, this stay did not apply to Ventures. The service clock therefore continued to run until Scarola filed an involuntary bankruptcy petition against Ventures on May 11, 2010—155 days after the complaint was filed. The stay as to Ventures was lifted on June 28 and Scarola purportedly served Ventures on July 1. Thus, Ventures was not served until 158 days after the complaint was filed.

Scarola has not shown "good cause" for this failure. The bankruptcy court found that Scarola deliberately did not serve Ventures in this lawsuit as a tactical maneuver in an attempt to force a settlement and avoid having counterclaims filed against it. In any event, Scarola neither made any effort to effect service on Ventures nor requested an extension of time to serve. Although "district courts have the discretion to grant extensions of the service period even where there is no good cause shown," *Zapata,* 502 F.3d at 196, the exercise of such discretion is wholly unwarranted here. Accordingly, the complaint is dismissed without prejudice against Ventures.

2. Interactive
Interactive argues that this action should be dismissed for lack of personal jurisdiction, or, in the alternative, transferred to the District of New Jersey pursuant to 28 U.S.C. § 1404(a). Scarola contends that there are sufficient facts supporting personal jurisdiction over Interactive. If the Court finds otherwise, Scarola requests additional discovery and a hearing on the issue of personal jurisdiction. Scarola also opposes transfer of this action to New Jersey on the grounds that this was the "first-filed action."

Even if personal jurisdiction exists as to Interactive, this action should be transferred to the District of New Jersey where the New Jersey action is pending. The relevant law is well established. Section 1404 provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). District courts have "broad discretion in making determinations of convenience under Section 1404(a) and notions of convenience and fairness are considered on a case-by-case basis." *D.H. Blair & Co., Inc. v. Gottdiener,* 462 F.3d 95, 106 (2d Cir.2006). The movant bears the burden of establishing, by "clear and convincing evidence," that a transfer of venue is warranted. *N.Y. Marine & Gen. Ins. Co. v. Lafarge N.* Am., Inc., 599 F.3d 102, 114 (2d Cir.2010).

**\*4** If the transferee court would also have jurisdiction over the case, the court must determine whether, considering the "convenience of parties and witnesses" and the "interest of justice," a transfer is appropriate. In making that determination, a court considers:

> (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, and (7) the relative means of the parties.

*Id.* at 112. A court may also consider "the forum's familiarity with the governing law" and "trial efficiency and the interest of justice, based on the totality of the circumstances." *Berman v. Informix Corp.,* 30 F.Supp.2d 653, 657 (S.D.N.Y.1998).

If there are duplicative actions, a court must also consider whether the first-filed rule applies. "The first-filed rule states that, in determining the proper venue, where there are two competing lawsuits, the first suit should have priority." N.Y. Marine, 599 F.3d at 112 (citation omitted); *see also D.H. Blair,* 462 F.3d at 106. "This rule embodies considerations of judicial administration and conservation of resources by avoiding duplicative litigation and honoring the plaintiff's choice of forum." *Emp'rs Ins. of Wausau v. Fox Ent't Grp., Inc.,* 522 F.3d 271, 275 (2d Cir.2008) (citation omitted).

There are two recognized exceptions to the first-filed rule: "(1) where the 'balance of convenience' favors the second-filed action, and (2) where 'special circumstances' warrant giving priority to the second suit." *Id.* (citation omitted); *see also N.Y. Marine,* 599 F.3d at 112. "Special circumstances include manipulative or deceptive behavior on the part of the first-filing plaintiff." N.Y. Marine, 599 F.3d at 112. Thus, "the first-filed rule is only a presumption that may be rebutted by proof of the desirability of proceeding in the forum of the second-filed action." *Id.* at 113 (citation omitted).

Here, even if this action were filed first[2], special circumstances exist to justify an exception to the first-filed rule. First, there is evidence that this was an anticipatory lawsuit. Scarola concedes that after it received "defendants'

Scarola Ellis LLP v. Skyworks Ventures, Inc., Not Reported in F.Supp.2d (2010)

2010 WL 3452381

threat that they would imminently file their own action presumably in New Jersey or some other inconvenient jurisdiction, [Scarola] determined to re-file the action—this case-so as to be sure no preemptive action was filed against it in a different jurisdiction." Additional evidence of Scarola's manipulative behavior is its abandonment of its September 30, 2009 lawsuit as the defendants' time to answer neared, and the fact that after filing this action, it neglected to serve Ventures until well after 120 days had lapsed. Scarola also did not serve Interactive until the very last possible day under Rule 4(m). The bankruptcy court has found that Scarola purposefully failed to prosecute this action and pursued its involuntary bankruptcy petition against Ventures in bad faith in an attempt to force defendants into a settlement and to abandon their counterclaims against Scarola. Scarola has offered no other plausible explanation for its behavior.

 *5  Moreover, the balance of convenience and judicial economy favor transfer. Interactive contends that personal jurisdiction is lacking in this forum, but the parties do not dispute that the District of New Jersey would have jurisdiction over this matter. Although a plaintiff's choice of forum is ordinarily accorded significant deference, such deference is inappropriate where, as here, the plaintiff has failed to diligently prosecute the action in its chosen forum. Transfer will also promote trial efficiency because it will permit consolidation of this action with the New Jersey action, both of which arise out of the same transactions. Scarola itself acknowledges that the two actions are "substantially similar ." This factor therefore weighs heavily in favor of transfer.

The other § 1404(a) factors are either neutral or favor transfer. All of Interactive's employees, witnesses and documents are located in New Jersey. In addition, given that many of Interactive's employees may no longer work for the company, but are more likely to be in New Jersey than New York, transfer will allow those employees to be subject to

compulsory process in New Jersey. The relative means of the parties also favors transfer. Scarola, a New York law firm, is obviously more capable of litigating outside its home district than Interactive, a struggling start-up company with little or no connections to New York. In any event, consolidating the litigation between Scarola, Interactive, and Ventures in New Jersey will allow all parties to conserve resources.

While Scarola's attorneys and billing records are located in New York, Scarola has not shown that it would be burdensome to litigate this action in New Jersey. Indeed, it will already have to travel and transport its documents to New Jersey as part of the New Jersey action. Scarola claims that most of its work for Ventures and Interactive was performed in New York, but it does not dispute that it chose to service a New Jersey client or that some its meetings with Ventures occurred in New Jersey. Thus the locus of operative facts is a neutral factor. Lastly, both fora are equally familiar with the governing law, and therefore this factor is neutral. Accordingly, transfer of this action to the District of New Jersey is clearly warranted.

CONCLUSION

Defendants' July 6, 2010 motion to dismiss the complaint or, in the alternative, transfer this action, is granted in part. The complaint is dismissed against Ventures without prejudice. The Clerk of Court shall transfer the remainder of the action against Interactive to the District of New Jersey.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3452381

Footnotes

1    Ventures' principal place of business was in New York until it relocated to New Jersey after it purchased Interactive in December 2007.

2    Interactive argues that the New Jersey action qualifies as the "first-filed" action because Scarola was served with the complaint in that action before Interactive was served in this case, and therefore the New Jersey court was the first to obtain jurisdiction over the parties. This argument need not be addressed because even if this action were filed first, transfer is nonetheless appropriate under the circumstances of this case.

**End of Document**                                             © 2020 Thomson Reuters. No claim to original U.S. Government Works.